# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

VINCENT FORBES,

   *Plaintiff,*

vs.

              Case No. 14-1228-EFM

KINDER MORGAN, INC.,

   *Defendant.*

## MEMORANDUM AND ORDER

Many have yearned to strike an irksome coworker.  But few relent to that impulse, break their coworker's nose, lose their job, and then sue their former employer.  From the few, enter Plaintiff Vincent Forbes.  No longer Defendant Kinder Morgan, Inc.'s Kansas plant operator, Forbes now sues Kinder Morgan claiming that (1) age discrimination, (2) breach of an implied employment contract, (3) negligent hiring and retention, and (4) intentional infliction of emotional distress all unlawfully distinguish his employment termination.  In its motion for summary judgment now before the Court, Kinder Morgan responds that it fired Forbes only for causing injury and without adding insult.  For the reasons explained below, the Court finds that the undisputed material facts entitle Kinder Morgan to judgment as a matter of law on each of Forbes' four claims.

## I.   Factual and Procedural Background[1]

Notwithstanding his violent encounter with coworker Norman Rogers, Plaintiff Forbes was a reliable and praiseworthy employee of Kinder Morgan and its gas-pipeline-company predecessors.  Forbes initially worked for El Paso Corporation at its Morton County Station ("Station") in Elkhart, Kansas.  Nearly 20 years after Forbes started work at the Station, Kinder Morgan acquired El Paso Corporation.  When Kinder Morgan purchased El Paso Corporation in May 2012, it offered Forbes employment at his current position.  Forbes accepted.  And at 57 years old, Forbes continued his old work for his new employer.  Nine months passed.  Forbes continued his commendable work.  And Kinder Morgan approved of Forbes' performance, until a poorly played prank was even more poorly received.

*From Prank to Punch*

At the end of a 12-hour, overnight shift, Forbes entered his truck to leave the Station for some well-earned repose.  Before reaching the comfort of his bed, however, before he even reached the parking lot's end, Forbes' tire encountered an angle iron.  Seemingly sharpened and placed to optimally inconvenience him, the angle iron partially damaged Forbes' truck tire.  Forbes took his frustration and the angle iron to the control room.  "Somebody put this under my tire, and if it ruined my tire, somebody's paying for it," he announced to those present, including Ronnie Anderson, the Station operations supervisor, and Norman Rogers, a corrosion technician.  Forbes tossed the angle iron to the control room floor.  He departed the room, the Station, and the day's torments for home.

---

[1]   Adhering to summary judgment procedures, the Court relates the following uncontroverted facts in the light most favorable to Forbes.

A better-rested Forbes returned to the Station later that same day, on March 7, 2013, to work another control room shift.  A coworker also upset over somebody somehow messing with his vehicle greeted Forbes at his shift's beginning.  Forbes decided, "it's time we put a stop to this."  And both workers headed for Anderson's office.

Forbes recalls that the following exchanges took place during and immediately after visiting Anderson's office.  Rogers was seated in Anderson's office when Forbes arrived.  "Ronnie, can I speak to you for a minute?" Forbes asked.  Anderson agreed.  Forbes clarified, "I really prefer to speak to you privately."

Rogers rose from his seat.  "Is this about your tire?"

"Yes, it is," answered Forbes.

"Well, I did it.  I'll pay for it if I have to, but you're going to prove it's ruined.  I think you're lying."

"I already took care of the tire."

"Guys, its over right now," Anderson interrupted.  "No more messing with the vehicles.  We're drawing a line.  It's over."

Forbes agreed, "No problem."

Rogers moved face to face with Forbes.  "I'll pay for that tire, but I don't believe I ruined it."

Forbes shot back, "So you just think I'm a f*cking liar?"

"I think you're a liar."

Indignant at the accusation, Forbes left Anderson's office to return to the control room.  His exit carried him down a hallway past Mike Popejoy's office.  Curious about the status of certain work that Popejoy oversaw earlier, Forbes entered Popejoy's office.  The two men

conversed.  Forbes satisfied his curiosity.  Popejoy resumed work at his desk.  And Forbes turned to leave Popejoy's office.  As Forbes turned, Rogers appeared in Popejoy's office doorway.

Rogers started in on Forbes, "I think you're lying.  I'm not going to pay for that tire unless you can prove to me it's been ruined."

"Norman, we're not going there."  Forbes maneuvered right to pass on Rogers' left through the doorway and to withdraw to the control room.

Rogers countered Forbes' maneuver.  The distance between the men shrank.  Chest to chest, Rogers lodged his 50-pounds-heavier frame against Forbes.

"Norman, we don't need this crap.  It's over. Ronnie said it's done."  Forbes rotated his body perpendicular to Rogers to inch through the unoccupied doorframe space.

Again, Rogers opposed.  One chest roughly against another, the two men stalled.  "It ain't over.  I'm paying you for that tire whether you like it or not."

Forbes stepped back.  "No, Norm.  Ronnie says it's over.  You let me out of this office. I'm going to mine.  Just let me out of the office. It's over."  One more time, Forbes started for the door.  His progress and his patience ended one step forward when he encountered the butt of Rogers' chest.

Forbes hit Rogers.

His clenched right fist connected with Rogers' face with enough force to fracture Rogers' nose.  Blood scattered across Rogers' body and Popejoy's office.  Forbes continued to swing his fists, all without the success of his initial strike.  Rogers attempted to return Forbes' blows.  But neither man penetrated the other's defenses.  Rogers eventually stumbled backwards into Popejoy's desk.  And the two carried on, until Forbes sent Rogers tumbling to the floor by seizing Rogers' leg at the peak of an errant kick.  Eager to leverage the separation, Popejoy

dashed between the men.  He squared himself with Forbes, pushed him into the hallway, and sealed the office door with Rogers inside.

"What happened?  What happened?"  Anderson hollered as he rushed down the hallway. When he arrived, Rogers emerged through Popejoy's office door.  Blood, still spilling from Rogers' nose, covered Rogers' shirt front and stained Forbes' hand.  Anderson surveyed Rogers' condition.  Forbes stood silently by, too jarred to hear any conversation that may have been taking place until Anderson raised his voice, "Get to the control room."  Forbes left for the control room.  He remembers no other details of the confrontation.

*Kinder Morgan's Investigation*

News of the day's brawl soon reached Matt Mask, the Kinder Morgan director responsible for remotely overseeing the Station.  Mask promptly ordered that Forbes and Rogers be suspended without pay, pending an investigation.  Mask tasked the investigation to Linda LaFrenierre, Kinder Morgan's Colorado-based senior human resources administrator.  The investigation occurred over the following two work days, Friday March 8 and Monday March 11.  To avoid any interference with her other upcoming work commitments, LaFrenierre decided to conduct phone rather than in-person interviews.  In total, LaFrenierre spoke with nine Station employees, including Anderson, Forbes, Rogers, and Popejoy.  She took notes during each interview.  Her interviews concentrated on two questions.  What happened between Forbes and Rogers?  And does their quarrel signal broader problems at the Station?

*Anderson's Interview*.  Anderson recalled rumors that attributed questionable practical jokes to Rogers, like placing a cinder block under someone's car.  But he explained to LaFrenierre that he had never personally observed or experienced any of Rogers' pranks.

Specifically regarding the angle iron prank, Anderson reported the events much as Forbes recalled them.  Absent from Forbes' recollection, however, Anderson described a generally more benign Rogers.   Rogers visited Anderson's office shortly before Forbes, on the afternoon following Forbes' overnight shift.   Anderson insisted that if Rogers was meddling with others' vehicles, he immediately stop meddling.   Anderson considered the matter resolved and took a phone call.  Before Rogers left Anderson's office, Forbes arrived.  Forbes and Rogers began a civil conversation.  Much of that conversation escaped Anderson's attention.  But his phone call left him attentive enough to overhear Rogers apologize to Forbes.   He also watched Forbes' attitude sour when Rogers asked to see and offered to replace Forbes' damaged tire.  Forbes quit the office.   Seconds later, Rogers exited.   And Anderson kept to his call, until anonymous shouting called him elsewhere.  Down the hall, Anderson found Popejoy holding shut his office door and holding off Forbes.   As Anderson neared Popejoy and Forbes, he noticed Rogers pulling at Popejoy's door from within.  Anderson eyed Forbes, "Knock it off!"

Forbes held his focus on Popejoy.  "Get out of my way or I'm going to give you some."

"Vince, knock it off!"  Anderson's second command stilled Forbes.  "You need to go to the control room."  Forbes obeyed.  Anderson pressed Popejoy's door open, exposing Rogers.  Raw blood dotted the paperwork and fixtures of Popejoy's office.  Still rawer blood poured from Roger's irritated nose.  "Get down to the break area and try to clean up."

Anderson briefly spoke with each man involved.  Rogers explained that he stopped at Popejoy's office to apologize to Forbes.  Forbes described Rogers preventing his exit by chest-bumping him three times.  And Popejoy declared that Forbes hit Rogers.  Anderson ultimately took these reports to his supervisor and awaited instruction.

-6-

*Forbes' Interview*.   Forbes responded to LaFrenierre's questions with an account near identical to the above account recreated from his memory.   Forbes contextualized that account with brief details about relationships at the Station.   Generally, non-physical horseplay and teasing between employees was not uncommon.   One prank, for example, involved placing sexually explicit stickers on an employee's car.   And amid this atmosphere, Forbes and Rogers generally had a good working relationship.  But Forbes believed that Rogers crossed a line when Rogers' March 7 behavior interfered with his property, integrity, and safety.

*Rogers' Interview*.   Rogers described to LaFrenierre a somewhat different version of the altercation, particularly concerning what occurred in Popejoy's office.   What occurred in Popejoy's office followed from a mannerly discussion about woodworking in Anderson's office. Forbes and Rogers' woodworking conversation ended when Rogers transitioned to discuss his prank—"As for your tire, I'll make it right."   When Forbes replied that he had already taken care of the tire, Rogers insisted, "Let me pay.   You show me the old tire that's damaged and I'll pay you for it."

Forbes exploded.   "Now you're calling me a f*ckin' liar.   You son-of-a-b*tch."

"Let's talk about it," Rogers offered.

"I don't have time for this."   Forbes took off down the hallway.

Rogers glanced at Anderson. "Well, Ronnie, I feel like I need to go look and see if there's a new tire on his vehicle.   If there is, I'm going to pay him for it."   Rogers headed for Forbes truck.   But he abandoned his heading moments later.   Loud complaints reverberated from Popejoy's office.   Rogers peeked into the office and noticed Forbes yelling.

Forbes noticed Rogers.   "You son-of-a-b*tch, you're always messing around."

-7-

"Vince, I don't know why you're so upset.  I've told you I will compensate you for it.  I'm very sorry.  I'll pay for the tire.  I don't know why you're upset."

Forbes approached Rogers at the doorway and pushed Rogers as he passed.  "Get the f*ck out of my way.  I ain't got time to f*ck with you."

Rogers stepped aside and pleaded again, "Vince, let's go look at the tire.  I'll pay you for it.  You don't have to be so angry."

Forbes crowded Rogers' face.  "I told you I don't have time to f*ck with you."

"You don't have to do it.  I'll go look at it myself."

Forbes' looming frustration intensified.  And he seized Rogers' bicep.  "I don't have time to f*ck with you."

Rogers pushed Forbes back and turned to Mike. "Did you see Vince grab me?"  Before he received an answer from Popejoy, Forbes shot his fist across Rogers' face.  A torrent of wayward blows followed from Forbes.  Rogers did his best to evade Forbes' punches and kicks.  He quickly turned his back to Forbes and moved toward Popejoy's desk.  Rogers doubled over the desk and flattened his palms against its surface.  He hoped to ground himself long enough for the onslaught to end by Forbes' exhaustion rather than by the necessity of his own vigor.

Ultimately, neither ended the brawl.  Forbes continued to strike Rogers' head and taunt, "You want some more of this?"  Popejoy wrapped Forbes' from behind and worked the two apart.  Anderson's arrival finally subdued and separated the men.

Rogers emphasized to LaFrenierre that he never raised his voice or his fists against Forbes.

*Popejoy's Interview*.  LaFrenierre learned that Popejoy knew of no prior ill will existing between Forbes and Rogers.  He also considered the Station to be generally problem-free.  Nonetheless, as the only bystander, Popejoy witnessed Forbes strike Rogers.

By Popejoy's account, a visibly agitated Forbes entered his office fussing loudly about some, uninteresting incident.  Popejoy explained that he initially ignored Forbes to focus on work at his computer.  Despite keeping his back to Forbes and the office door, Popejoy noticed Rogers' arrival.

Rogers stood at the door and apologized. "Vince, I'm sorry.  I didn't mean to upset you.  I'll buy you a new tire."

Popejoy remained focused on his work.  He redirected his attention when he heard shuffling and a thud.  Behind him, Forbes forced Rogers against the office wall opposite to Popejoy's desk.  Rogers somehow peeled away from the wall.  And at the exact moment that Popejoy caught sight of the unfolding scuffle, Forbes hooked his right fist across Rogers' face.  The blow spattered blood around the office and left Rogers' nose "just destroyed."  Rogers hung himself over a nearby desk and exposed his back to Forbes.  "[L]ike a bull at a Mexican bull fight," Forbes relentlessly distributed punches over Rogers' body.  Popejoy resolved to intervene.  With a matador's courage, he approached Forbes from the rear and smacked Forbes' back.  Twice he repeated, "Stop, Vince.  Stop!"  When Forbes continued, he locked Forbes' arms behind Forbes' back.

Forbes scorned the interference.  "Do you want a piece of this?"

Undeterred by Forbes' threat, Popejoy dragged Forbes out of the office.

Still enraged, Forbes warned Popejoy.  "Let me go or you're going to get a piece of this."

Popejoy released Forbes but kept his hands raised to fend Forbes away from the open door.  With a spare glance toward the room, Popejoy noticed Rogers approaching the door.  Blood discolored Rogers' face and shirt.  And eager to prevent more bloodshed, Popejoy reached into the office for the door's handle.  Popejoy swung the door closed, sealing him and Forbes in the hallway.  Popejoy made one final appeal to Forbes: "Vince, go to the control room."  And when Anderson arrived and made the same appeal moments later, Forbes complied.

*Other Interviews*.  In LaFrenierre's words: "The general consensus by those not directly involved in the event is that Norm is prone to playing practical jokes and Vince can be a 'hothead'.  No one was able to recall another incident in which Vince had physically assaulted another employee.  The investigation did <u>not</u> uncover a larger problem at the facility (morale, ethics, etc.)."

*Discipline and Consequences*

At the investigation's end on March 11, LaFrenierre presented her findings to Mask.  Mask conferred with LaFrenierre, most of the lineal chain of supervisors above and below him responsible for Forbes, and Kinder Morgan's legal department about the investigation's results and possible discipline.  Mask believed that LaFrenierre's investigation substantially confirmed the facts initially reported to him: Rogers inappropriately pranked Forbes; Forbes appropriately complained to Anderson; Anderson addressed both Forbes and Rogers; Rogers then privately addressed Forbes; emotions escalated; a fight—the first in either employees' work histories— ensued; Forbes broke Rogers' nose; and no reports other than Forbes' report indicated that Rogers reciprocated Forbes' violence.  Believing these facts, Mask viewed Forbes as "the aggressor" and Rogers as "the recipient of the aggression."  But he also understood that each

employee contributed to the violent outcome.  Consequently, Mask deemed discipline necessary for both employees.

Yet Mask did not deem identical discipline necessary.  Instead, Mask reckoned that one employee's prank does not another employee's punch equal, and so unequal misdeeds must yield inequivalent punishments.  Mask believed that Kinder Morgan's workplace policy required him to draw a line: "We cannot have violence and physical force at the job site."  Mask also believed that Forbes' actions crossed the violence line and Rogers' actions did not.  Accordingly, Mask proposed that Kinder Morgan fire Forbes and suspend but ultimately retain Rogers.  LaFrenierre confirmed that, consistent with Kinder Morgan's workplace policies, Forbes' conduct supported termination.  And on March 12, Kinder Morgan disciplined both employees.  With the unanimity of a 62-year-old LaFrenierre, Anderson's 55-year-old supervisor, Mask's 45-year-old supervisor, and Kinder Morgan's attorneys, a 54-year-old Mask fired a 58-year-old Forbes and temporarily suspended a 50-year-old Rogers, all without knowing either employees' ages.  After firing Forbes, Kinder Morgan hired a 46-year-old plant operator and a 49-year-old plant operator.

Forbes struggled following his suspension and termination.  His wellbeing atrophied due to acute anxiety over his ability to care for his ill wife.   Per protocol during her March 8 phone interview with Forbes, LaFrenierre suggested that Forbes use Kinder Morgan's employee assistance program.  On LaFrenierre's suggestion, Forbes visited a mental health professional to manage the emotional hardship resulting from his fight with Rogers.  Though that professional was associated with Kinder Morgan's employee assistance program, Kinder Morgan ultimately refused to pay Forbes' treatment costs. At his first visit on March 11, Forbes remorsefully recounted the events leading to his suspension.  The next day, Kinder Morgan terminated Forbes' employment.   Because the for-cause termination ended his health insurance coverage, the

provider of his wife's oxygen machine reclaimed the machine.  And the concern that her condition might deteriorate correspondingly caused Forbes' condition to ebb.  Surges of insomnia, hopelessness, and crying overwhelmed him.  But almost two weeks later, his condition improved.  At his second and final mental health appointment on March 27, Forbes gave positive reports about his condition and outlook.

Just over a year later, Forbes sued Kinder Morgan in Kansas state court.  Kinder Morgan removed the action to this Court on the basis of diversity and federal question jurisdiction.  Now, Kinder Morgan moves for summary judgment on each of Forbes' four claims: age discrimination, breach of an implied employment contract, negligent hiring and retention, and intentional infliction of emotional distress (also known as outrage).  Forbes' claims cannot survive.

## II.    Legal Standard

At summary judgement, Forbes' claims live or die by the production of certain evidence. The Court must grant summary judgment if the movant, Kinder Morgan, shows that the genuinely undisputed facts also legally entitle it to judgment.[2]  Claim by claim, Forbes can create a "genuine," summary-judgment-denying factual dispute if he produces evidence that would permit a reasonable jury to decide the essential issues in either his or Kinder Morgan's favor.[3] But initially, he need do nothing.  Kinder Morgan bears the initial burden to show the absence of evidence essential to Forbes' claims.[4]  If Kinder Morgan shoulders its burden, then Forbes must act.  Forbes may not simply rest on his pleadings or other conclusory allegations; he must instead

---

[2] Fed. R. Civ. P. 56(a).

[3] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016).

[4] *Id.*

"set forth specific facts" using evidence that would be admissible at trial, and those facts must enable a rational factfinder to find for him.[5]  The parties must clearly identify their facts through "particular" citation to affidavits, deposition transcripts, incorporated documentary exhibits, or other admissible evidence.[6]  Once the parties complete the summary judgment record, the Court's work begins.  While considering whether the parties meet their respective burdens of production, the Court views all the particularly cited evidence and reasonable inferences therefrom in the light most favorable to the nonmovant, Forbes.[7]

### III.    Analysis

## A. Age Discrimination

Forbes first claims by indirect evidence that Kinder Morgan unlawfully fired him because of his age and not his actions.[8]  An employer generally breaks anti-ageist law if it discharges an employee "because of" that employee's age.[9]  A discharge occurs "because of" age if the employee's age was the "reason" for, " 'but-for' cause" of, or, again stated otherwise, "factor that made a difference" in the employer's decision.[10]  To determine whether trial-worthy, indirect age discrimination evidence exists, courts use the tripartite framework set forth in

---

[5] *Id.* at 1137–38.

[6] Fed. R. Civ. P. 56(c); *see also Savant Homes, Inc.*, 809 F.3d at 1137.

[7] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

[8] Forbes claims age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Kansas Age Discrimination in Employment Act ("KADEA") , K.S.A. § 44-111, *et seq.*  Kansas courts use the ADEA's summary judgment burden-shifting framework and related persuasive authority to analyze KADEA claims.  *See Beech Aircraft Corp. v. Kan. Human Rights Comm'n*, 254 Kan. 270, 272–73, 864 P.2d 1148, 1151 (1993); *Bittel v. Pfizer, Inc.*, 307 F. App'x 132, 136 n.3 (10th Cir. 2009).  Consequently, the Court applies federal authority without distinction.

[9] 29 U.S.C. § 623(a)(1); K.S.A. § 44-1113(a)(1).

[10] *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (quotations omitted).

-13-

*McDonnell Douglas*.[11]   Normally, this framework would require Forbes to establish a prima facie case of age discrimination and, once established, Kinder Morgan to provide a legitimate, nondiscriminatory reason for its termination decision.[12]   Neither party, however, disputes that the other meets its initial burden.   Instead, the parties dispute whether Forbes shoulders the final burden: "prov[ing] by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."[13]   So the Court's remaining task is to discern whether Forbes produces evidence that would enable a reasonable jury to find that Forbes' age, not his atypical violence towards Rogers, ultimately motivated Kinder Morgan's decision to fire Forbes.

Evidence of pretext may take a variety of forms, so long as it reveals doubt-inducing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for the termination.[14]   Forbes presents three arguments why a jury reasonably should doubt Kinder Morgan's age-neutral explanation for firing him.   First, Forbes argues that Kinder Morgan altered its company policy after the fact to justify firing him.   Second, Forbes argues that Kinder Morgan treated him more severely than Rogers.   Third, Forbes argues that a reasonably jury cannot square Mask's explanation for firing him with the true facts about what occurred between him and Rogers.   As the Court walks the analytical miles covering

---

[11] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972).

[12] *Id.* at 804.

[13] *Simmons*, 647 F.3d at 947.

[14] *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118–19 (10th Cir. 2007).

Forbes three arguments, it must do so in Mask's shoes—cautious at once both to view the facts as they appeared to Mask and not to second-guess any business judgments made in good faith.[15]

## 1. Kinder Morgan's Antiviolence Policy

Evidence that an employer's decisionmaking process contradicted the employer's written or unwritten policies may enable the Court to infer that discrimination unlawfully motivated the decision.[16]  But any policy-deviating evidence short of a "disturbing procedural irregularity" will not suffice for pretext.[17]  Neither will it suffice for the plaintiff to produce evidence tending to prove the mere fact that an employer deviated from its internal procedures[18] or, retrospectively, made a poor decision.[19]  Why?  Because neither fact alone is aberrant enough to displace the likelihood that a nondiscriminatory, trivial, or even accidental, motive explains the inconsistency.[20]  Only a gross deviation from expected (and thus reasonable) behavior invites the trial-worthy question: is the employer's nondiscriminatory explanation sincere?[21]

Forbes argues that the evidence rightfully before the Court creates a genuine factual issue as to whether Kinder Morgan sincerely fired Forbes for violence.  Forbes specifically points to

---

[15] *Id.* at 1119.

[16] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[17] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007).

[18] *Hysten v. BNSF Ry. Co.*, 415 F. App'x 897, 905 (10th Cir. 2011) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)) ("The mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.").

[19] *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (quotation omitted).

[20] *See Kendrick*, 220 F.3d at 1232 ("Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext.").

[21] *See Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1106 (10th Cir. 2008) (quotation omitted) (reasoning that procedural irregularities become "disturbing" and thus evidence of pretext when they are "so idiosyncratic or questionable that a factfinder could reasonably find that [the [challenged process] was a] pretext for illegal discrimination".).

certain dates listed on the relevant policies from Kinder Morgan's tab-structured Human Resources Policy Manual ("HR Manual").  With its initial support memorandum, Kinder Morgan submitted a copy of its "The Workplace" policy.  That policy—Tab 3 of the HR Manual—contains a "Violence in the Workplace" section.  That section prohibits an employee from performing "any act or threat of violence."  Kinder Morgan's version of "The Workplace" policy (and its "Violence in the Workplace" section) has a January 1, 2000 effective date and a revision date of March 8, 2013—the day after the March 7 conflict.  Forbes submits a competing version of the relevant policies from Kinder Morgan's HR Manual.  Like Kinder Morgan's version of "The Workplace" policy, Forbes' version of "The Workplace" policy—still Tab 3 of the HR Manual—has a January 1, 2000 effective date.  Forbes' version of "The Workplace" policy, however, depicts a September 2, 2014 revision date and omits a "Violence in the Workplace" section.  Instead, Forbes' version of the HR Manual depicts the "Violence in the Workplace" section as being included verbatim in a distinct "Violence and Security in the Workplace" policy—Tab 29 of the HR Manual—that took effect July 1, 2014.  So the parties present differently organized but identically worded versions of Kinder Morgan's antiviolence policy.[22] Both versions represent that the respective policies took revised effect subsequent to Forbes and Rogers' dispute.  From these facts, Forbes argues that the evidence shows that Kinder Morgan deliberately and unfairly altered its company policy after the fact to justify its decision to terminate Forbes' employment for cause.[23]

---

[22] With its reply brief, Kinder Morgan filed an ostensibly authenticated third version of its HR Manual—the version extant at the time of the March 7 fight.  Forbes filed a surreply objecting to the Courts' consideration of those documents.  Because Forbes' HR Manual-based arguments fail no matter which HR Manuals the Court considers, the Court disregards the third HR Manual and Forbes' related objections.

[23] Forbes later restates this argument in support of his outrage claim.  This argument—that Kinder Morgan fabricated an antiviolence policy to justify firing Forbes—appears nowhere in the parties' pretrial order.  Generally

Inferring pretext from this evidence would require the Court to ignore the law and adopt speculation.

Temporarily assume that a reasonable jury could read Kinder Morgan's policies, as Forbes, to infer that no antiviolence provision existed prior to March 8, 2013.  Also temporarily assume that a reasonable jury somehow could connect the alleged untimely introduction of an antiviolence policy specifically with age bias.   Then what?   The law will not regard circumstantial evidence of bias as probative of pretext unless "some logical nexus" connects that evidence to the employer's decision to terminate.[24]  Forbes offers only the policies' dates.  Like Forbes, a jury could use this bare evidence as *a* nexus to connect Forbes' unemployment with revisions to Kinder Morgan's policies.  But based only on the policies' dates, a reasonable jury could not *logicially* connect Mask's decision to fire Forbes with Kinder Morgan's policy revisons.  No specifically identified evidence shows that Mask participated in the revisions or otherwise possessed the authority to revise Kinder Morgan's HR Manual.  Only a speculative and thus inadequate nexus connects the existence of Kinder Morgan's antiviolence policy with Mask's decision to fire Forbes.

Without that nexus, the Court is left to consider whether a reasonable jury could regard Mask's decision as weak, implausible, inconsistent, incoherent, or contradictory in light of: (1) the mere absence of evidence tending to show that Kinder Morgan had a formal policy against violence prior to March 8 and (2) evidence showing that Mask believed that Kinder Morgan's

---

the parties must adhere to the claims and arguments raised in the pretrial order.  But the Court will still consider Forbes' evidence and argument.  After all, Kinder Morgan had an opportunity to respond to Forbes' position in its reply brief; it did not need additional discovery to respond; and importantly, it did not object (as it did in the negligence-section of its reply brief) to the Court's consideration of this previously unalleged argument.

[24] *Timmerman*, 483 F.3d at 1115, 1117–18.

-17-

policies supported his decision.  Here, the absence of an extant, formal antiviolence policy—Forbes' only evidence—fails to show that Mask unreasonably believed in the age-neutral policy basis for his decision.

Still keeping to the law, courts must not convert "[a]n articulated motivating reason . . . [in]to pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."[25]  In hindsight, the Court is only permitted to ask "whether [the employer] honestly believed [that the employee] . . . violated its policy and [then] acted in good faith upon that belief."[26]

So question Mask's decision, and consider the parties' evidence.  Consistently, Mask and other Kinder Morgan employees have explained that Forbes' violence towards Rogers motivated Forbes' employment termination.[27]  Mask believed that Kinder Morgan's policy discouraged "violence and physical force at the job site."[28]  LaFrenierre advised Mask that Kinder Morgan's policies supported firing Forbes.  Kinder Morgan's attorneys concurred.  And Mask's March 12 discipline decision technically occurred at a time when the undisputed evidence shows that Kinder Morgan's HR Manual contained an antiviolence policy—whether or not that "Violence in the Workplace" policy existed prior to its tab's March 8 revision date.  At best, Forbes evidence

---

[25] *Rivera*, 365 F.3d at 925 (quotation omitted).

[26] *Bittel*, 307 F. App'x at 140.

[27] *See Hysten*, 415 F. App'x at 909 (finding that, "regardless of whether [the employer's decisionmaker] knew that [the employee] had violated [the employer's] anti-violence rules," the employer's "repeated assertions that [the employee] was terminated for threatening a co-worker with violence" overshadowed "any minor inconsistencies" and thus precluded a rational factfinder from discounting the employer's legitimate explanation for the employee's dismissal).

[28] *See id.* at 910 (emphasizing that an employer's (mis)use of company policy amounts to pretext only if "the employee . . . present[s] evidence that the employer *believed* that a relevant company policy existed, and chose to deviate from the policy in spite of that belief."); *Bittel*, 307 F. App'x at 140 (declining to infer pretext from policy ambiguity because plaintiff's evidence failed to contradict evidence that plaintiff's employer "actually believe[d that plaintiff] had violated [the employer's] policies.").

could allow a reasonable jury to find that Kinder Morgan made the poor, perhaps even unfair, decision to fire him for misconduct prohibited by an ill-timed policy.[29]  But even with the benefit of hindsight, a reasonable jury could not question the "abundant and uncontroverted" evidence showing that Mask honestly believed that Forbes violated Kinder Morgan's policy.[30]  And as far toward inferring pretext as "disturbing procedural irregularities" evidence goes, Forbes evidence—opposed to Mask's sincere belief—goes not at all.

**2. Disparate Discipline**

Onward then to Forbes' second pretext-oriented argument: Kinder Morgan dealt more harshly with him than a younger employee, Rogers.  "[E]vidence that similarly situated employees received different treatment than the plaintiff is indicative of pretext."[31]  So is Forbes evidence that Kinder Morgan fired him but only suspended Rogers indicative of pretext? Standing alone, no.

For the Court to deem Rogers "similarly situated" to Forbes, evidence must tend to prove that, among other circumstances, Mask viewed both employees' respective conduct as comparably serious.[32]  Kinder Morgan's policies denounce both violence and vandalism.  But no offered evidence shows that Kinder Morgan's policies required Mask to view Forbes and

---

[29] Even assuming that Kinder Morgan's HR Manual *never* expressly prohibited workplace violence, the Court must decide against Forbes's position.  An employer's good-faith decision to fire an employee for conduct deemed disruptive to its operations but omitted from its misconduct policies is, after all, a business judgment.  Only impermissibly acting as a "super personnel department, second guessing" Kinder Morgan's business judgment could the Court impute age animus to Mask's explanation.  *Riggs*, 497 F.3d at 1119 (internal quotation marks and citation omitted).

[30] *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1281 (10th Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)) ("[A]n employer would be entitled to summary judgment . . . 'if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue *and* there was abundant and uncontroverted independent evidence that no discrimination had occurred.' ").

[31] *Riggs*, 497 F.3d at 1120.

[32] *Hysten*, 415 F. App'x at 907; *Kendrick*, 220 F.3d at 1232–33.

Rogers' actions as equally unacceptable.  For violence, Kinder Morgan's policies announced "discipline, up to and including immediate termination of employment."  For corrective actions generally, Kinder Morgan's policies preserved managerial discretion.  In his discretion, Mask considered harming a coworker more serious than harming a coworker's property.  And, still in his discretion, he disciplined accordingly.  The law entitles an employer "to exercise its judgment" in determining how best to regulate its employees' (mis)conduct, without concern that its judgment must accord with the uninformed reckonings of some random judge.[33]  Judges get the last word, only to remedy "unlawful [employment] practices."[34]  Without evidence that Forbes and Rogers "violated workplace rules of comparable seriousness," the Court cannot consider their disparate discipline unlawful.[35]  And so the final disciplinary say belongs to Mask.

### 3. (In)Accuracy of Mask's Explanation

Discipline aside, Forbes' finally argues that Mask's view of what occurred between Forbes and Rogers is so factually flawed that a reasonable jury could disbelieve that Mask fired Forbes for an age-neutral reason.  Forbes can prove pretext through evidence that the defendant stated a false reason for the adverse employment action.[36]  Forbes almost entirely points to minor inconsistencies.  The minor inconsistencies concern discrepancies between Mask's deposition statements and others' reports about the events preceding the fight in Popejoy's office.  The only major inconsistency argued by Forbes concerns Mask's view that Forbes was the situation's

---

[33] *Kendrick*, 220 F.3d at 1233.

[34] *Id.*

[35] *Riggs*, 497 F.3d at 1120 (declining to find plaintiff similarly situated to other of defendant's employees because "no evidence suggest[ed] that the employer considered [those employees'] offenses to be as egregious as [plaintiff's offense]").

[36] *Kendrick*, 220 F.3d at 1233.

aggressor.  Offering only his own report of the fight's details, Forbes argues the contrary view that Rogers escalated the situation and caused Forbes to defend himself with force.  And because Mask took the opposite position, Forbes argues, Mask disregarded the truth and deserves a reasonable jury's scrutiny.

Only non-minor, doubt-inducing inconsistencies "constitute evidence of pretext."[37] Forbes has produced a scrupulously nitpicked handful of minor inaccuracies concerning Mask's understanding of the pre-fight events.  But those pre-fight inaccuracies relate too loosely to the fight's details and not at all to Mask's decision.  Mask disciplined Forbes based on his view of Forbes' fight conduct.   Because the fight—not pre-fight—details formed the repeatedly asserted basis for Mask's decision, only inconsistencies about those details will be probative of pretext.[38]

With regard to major inconsistencies surrounding the fight's details, Forbes argues only one: Mask mislabeled Forbes as the aggressor.  Forbes might be right; a decisionmaker more omnipotent than Mask might agree with Forbes' account of the fight.  But Forbes' argument is wrong.  Forbes' argument presumes that an employer must make a factually doubt-free decision to avoid an inference of pretext.  Not so.[39]  Evidence excludes an inference of pretext if it shows a good faith decision based on the facts presented.[40]  The facts presented to Mask included three

---

[37] *Hysten*, 415 F. App'x at 909.

[38] *See id.* (distinguishing superficial contradictions between employer's *statements about* its decision from the employer's consistently *stated reason for* its decision).

[39] *See Simmons*, 647 F.3d at 948 (remarking that the employer's decisionmaker "had discretion to err on the side of caution" when interpreting the facts underlying the plaintiff's employment termination); *McNeil v. Kennecott Holdings*, 381 F. App'x 791, 795 (10th Cir. 2010) (refusing to disturb an employer's business decision to believe other employee's reports instead of plaintiff's alternative explanation).

[40] *McNeil*, 381 F. App'x at 795; *Rivera*, 365 F.3d at 925.

different firsthand, generally unverifiable narratives of the fight.[41]   Forbes, Rogers, and Popejoy—the only impartial witness—all consistently reported that Forbes punched Rogers. Forbes explained that he punched Rogers only after an increasingly hostile Rogers physically stalled his exit.   Rogers reported that he pushed Forbes once in passing to exit Popejoy's office, right before Forbes's broke his nose.   And Popejoy reported that he observed Forbes attacking Rogers but never observed Rogers attacking Forbes.   Considering these reports, Mask decided that the investigation overall supported a view that Rogers "was not the aggressor but the recipient of the aggression."   None of the evidence shows that Mask settled on a particular narrative because of Forbes' age.   So Mask's decision "is the sort of business judgment that courts"—and thus a jury—"may not second-guess."[42]

In review, Forbes' evidence shows that Kinder Morgan's decision perhaps was unwise (maybe Forbes deserved leniency for breaking a yet unexpressed rule), unfair (maybe Forbes and Rogers deserved more comparable discipline), and incorrect (maybe Forbes' truthfully reported the fight's details).   But courts "do not ask whether the employer's reasons were wise, fair or correct;" courts ask "whether the employer honestly believed its reasons and acted in good faith upon them."[43]   No evidence creates a genuine factual issue concerning whether Mask made a good faith, business-oriented decision.   No evidence shows that age played a determinative role

---

[41] Forbes also badly declares that the "cat's paw" theory of liability defeats Mask's reliance on the results of LaFrenierre's investigation.  Liability under that theory requires evidence that a subordinate employee's prejudice materially tainted the employer's decision.  *See Simmons*, 647 F.3d at 949–50.  No such evidence accompanies Forbes' allegation.

[42] *McNeil*, 381 F. App'x at 795.

[43] *Riggs*, 497 F.3d at 1118–19.

in Forbes' employment termination.[44]   Accordingly, the Court grants summary judgment to Kinder Morgan on Forbes' age discrimination claim.

## B. Breach of Implied Contract

If not because of his age, Forbes also claims that Kinder Morgan unlawfully fired him contrary to its obligations under an implied employment contract.   An implied employment contract bars an employer "from violating its own policies in discharging the employee."[45]   Yet an implied employment contract exists only if the totality of the circumstances show more than the employee's "own unilateral expectations of continued employment."[46]   Specifically, the circumstances must show a "mutual intent" to limit the employer's otherwise unqualified right to end the employment relationship.

To Forbes, Kinder Morgan's "company policy . . . promised him a work place free of harassment, fair treatment, and confidentiality and promptness of his concerns;" and Kinder Morgan betrayed its promises when "[t]he same company policy . . . was used to terminate his employment without benefits."   To Kinder Morgan, the mutual intent to form an implied contract never existed; and even imagining its existence, Kinder Morgan never breached company policy.

To ascertain the parties' intent surrounding Forbes' employment, return with the Court to examine Kinder Morgan's offer of employment and HR Manual.   Like many of his coworkers, Forbes appreciated his gas-company-job's employment benefits and perceived job security. After acquiring the corporation that originally employed Forbes, Kinder Morgan offered Forbes

---

[44] *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) ("[A] disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.").

[45] *Abbott v. BNSF Ry. Co.*, 383 F. App'x 703, 708 (10th Cir. 2010) (quoting *Inscho v. Exide Corp.*, 29 Kan. App. 2d 892, 33 P.3d 249, 253–54 (2001)).

[46] *Id.* (quotation omitted).

continued employment at his current position.   Kinder Morgan's employment offer letter, the

enclosed offer "Acceptance Statement," and Kinder Morgan's HR Manual all disclaim

employment on any basis other than at-will.  The "Acceptance Statement," for example, reads:

> I, Vincent Forbes, do hereby accept this offer of continuing employment . . . with
> Kinder Morgan, the "Company" on an at-will basis, as described and explained in
> the offer letter . . . , which I acknowledge that I have read.  If employed, I
> understand that I have been hired at the will of the employer and my employment
> may be terminated at any time and for any reason without cause or any specific
> disciplinary procedures.   I further understand that if employed, my at-will
> employment can only be modified by a separate written document signed by the
> employee and an executive officer of the Company.

The offer letter further instructs that:

> There is nothing in this offer letter, the accompanying documents, or any other
> policy, procedure, practice, or benefits, that is intended to create an expressed or
> implied contract, guarantee, promise, or covenant of any type.  Employment at
> Kinder Morgan . . . is at will, meaning you or the Company may terminate the
> employment relationship at any time, and for any reason without notice, cause, or
> any specific disciplinary procedure.

Forbes signed and returned the offer Acceptance Statement.

At all times, Forbes had online access to Kinder Morgan's HR Manual.   Forbes

understood how to access the HR Manual and recalls partially reviewing it.  The HR Manual

begins with a disclaimer:

> It should be understood that policies arising from the unilateral action of the
> Company do not constitute a term or condition of employment or contract . . . .
> The contents of this handbook do not constitute a contract of employment.  Any
> oral or written statements to the contrary are expressly disavowed and cannot be
> relied upon by you.

A "Non-Contractual Notice" tab follows that introduction and precedes every policy in the HR

Manual.  That notice restates in detail Kinder Morgan's intent that its policies not modify the

intended at-will employment arrangements.   Following that notice, the HR Manual contains

discrete policies related to violence, harassment, fair treatment, and discipline.  Each of those

policies end with a disclaimer that begins: "This Policy does not constitute or imply a contract between the Companies and their employees."

To Forbes' knowledge, Kinder Morgan never told him that: he would always have a job; he would never be fired; he would never be laid off; and he would never be replaced by another person more qualified to do his work.  Forbes understood that for any reason, at any time, he could quit.  And he believed that two acts immediately would end his employment: stealing and fighting.  At his deposition, Forbes' exact words were: "If you got in a physical confrontation, right then both parties [were] gone . . . . Every time . . . . Period."

With only this evidence, Forbes is mistaken to insist that his claim survives under *Brown v. United Methodist Homes*.[47]  Forbes' *Brown*-based references advance two arguments: (1) the existence of an implied contract is "a classic question of fact that [must] be submitted to the jury;"[48] and (2) an employer's disclaimers are legally nondeterminative.[49]  True enough, in the proper context.  In the context of this case, however, neither principle earns Forbes the summary-judgment-denying result reached in *Brown*.

It is unnecessary to thoroughly discuss *Brown* to realize the unavailing character of Forbes' first argument.  Case by case, "[f]acts . . . vary;" and "just because a plaintiff alleges an implied-in-fact contract, a jury determination is not always required."[50]

Now to Forbes' second argument.  To be correct, an employer's disclaimers sometimes are legally determinative.  Disclaimers constitute "strong evidence" that the employer intended

---

[47] 249 Kan. 124, 815 P.2d 72 (1991).

[48] *Id.* at 141, 815 P.2d at 84.

[49] *Id.* at 136, 815 P.2d at 81.

[50] *Inscho*, 29 Kan. App. 2d at 896, 33 P.3d at 252.

to preserve the employment relationship's historically at-will character.[51]  And absent "evidence of contrary intent," disclaimers are "dispositive."[52]  But the employer's specific disclaimer in *Brown* "did not determine the issue as a matter of law."[53]

Critical to *Brown*'s result that the evidence required a jury determination, Brown offered varied evidence to contradict and undermine his employer's disclaimer.  Brown's evidence included his employer's policy manual and a supervisor's testimony that the employer "inten[ded] to treat employees fairly and to follow the rules."[54]  The policy manual, moreover, contrarily contained: a disclaimer added *after* the employee started working for the employer; language that "provide[d] for termination upon the happening of specific events;" and a stated policy that the employer intended to "go beyond the normal employment relationship" by "treating employees fairly . . . under the philosophy of Christian living."[55]  *Brown* emphasized that a "written personnel policy alone is not sufficient to establish an implied contract of employment."[56]

As evidence that he and Kinder Morgan impliedly agreed to disregard an at-will employment arrangement, Forbes produces Kinder Morgan's HR Manual and unspecific evidence that he and other coworkers considered their respective jobs secure.  Alone, Kinder Morgan's policies show only the employer's unilateral aspirations.  Under *Brown*, Forbes must

---

[51] *Abbott*, 383 F. App'x at 709.

[52] *Id.*

[53] *Brown*, 249 Kan. at 136, 815 P.2d at 81.

[54] *Id.* at 139, 815 P.2d at 83.

[55] *Id.* at 137–40, 815 P.2d at 82–84.

[56] *Id.* at 138, 815 P.2d at 83; *see also Brantley v. USD No. 500*, 405 F. App'x 327, 334 (10th Cir. 2010).

produce additional evidence of mutual intent.[57]  But Forbes' other evidence merely shows a meeting of the minds amongst certain employees; it fails to show "the required meeting of the minds between employee and employer" at the time Forbes' employment with Kinder Morgan commenced.[58]

Alternatively, evidence shows that Kinder Morgan consistently disclaimed its intent to employ Forbes on any basis other than at the parties' will.  Forbes acknowledged that he read and agreed to the disclaimers' terms by signing the Acceptance Statement.  And Forbes points to no specific HR Manual policy language or statements by Kinder Morgan to contradict their at-will employment agreement.  Because Forbes' unilateral expectations provide the only evidence to negate the parties' agreed-upon disclaimers, those disclaimers legally determine the parties' intent.[59]  On this evidence, Forbes remaining *Brown*-based argument must fail.

Still, imagining that a policy-based implied employment contract existed, nothing that Forbes has argued with the support of specific admissible evidence shows that Kinder Morgan violated its policies.  Forbes declares that Kinder Morgan's company policy promised him a harassment-free, confidentiality-preserving, fair workplace.  He substantiates his declaration not with specific policy language but with general policy titles.  And nonetheless, Forbes believed that workplace violence constituted cause for termination.  He may disagree that Kinder Morgan performed a thorough enough investigation.  He may disagree with Kinder Morgan's finding that

---

[57] *See Brantley*, 405 F. App'x at 334 (interpreting *Brown* to require that an employee "provide additional corroborating evidence before a court may conclude that a jury could find an implied contract.")

[58] *Inscho*, 29 Kan. App. 2d at 896–97, 33 P.3d at 253 (characterizing other employees' employment survey responses and human resource manager's testimony about termination decisions as evidence of plaintiff's "unilateral expectation that an implied contract existed").

[59] *See Abbott*, 383 F. App'x at 709 (interpreting Kansas law to regard an employer's extant disclaimers as legally determinative absent "evidence of contrary intent").

his conduct passed for violence and Rogers' conduct did not.  He may disagree with the discipline that he and Rogers ultimately received.  But for essentially the same reasons that Forbes' evidence fails to support an inference of pretext, the evidence also fails to create a genuine factual issue about whether Kinder Morgan arbitrarily deviated from its harassment, confidentiality, and fairness policies.[60]

Persuaded that no evidence suggests that an implied contract existed and, even so, that the decisionmaker doubtlessly believed that just cause supported Kinder Morgan's actions, the Court grants summary judgment to Kinder Morgan on Forbes' breach of implied contract claim.

## C. Negligent Hiring and Retention

Forbes next claims that Kinder Morgan indirectly caused the incident resulting in his employment termination because it negligently hired and retained Rogers.  Like all employers, Kinder Morgan is duty-bound to "hire and retain only safe and competent employees."[61]  Forbes initially argues that Kinder Morgan heedlessly hired and retained Rogers despite knowing Rogers' propensity for harmful pranks.  In nearly every way, Kinder Morgan disagrees.  But initially, Kinder Morgan disagrees that it ever owed Forbes—its non-third-party employee—a duty.  Forbes responds that his employee status "is irrelevant to the claim because Kansas law recognizes negligent supervision as a separate and distinct theory."

---

[60] *See Dyer v. Lane*, 564 F. App'x 391, 396–97 (10th Cir. 2014) (applying Kansas law) (concluding that employer had just cause to terminate plaintiff where plaintiff merely cited "the same evidence she cited as pretext to argue there was not just cause to terminate her"); *Inscho*, 29 Kan. App. 2d at 898–99, 33 P.3d at 253–54 (concluding that employer "did not act arbitrarily or without just cause in terminating" the plaintiff for pulling another employee's hair).

[61] *Plains Res., Inc. v. Gable*, 235 Kan. 580, 590, 682 P.2d 653, 662 (1984).

Forbes correctly states Kansas law; "Kansas law recognizes negligent supervision as a separate and distinct theory in addition to theories of negligent hiring and negligent retention."[62] But he incorrectly interprets that law's significance for his claim.  Procedurally, negligent supervision's status as a distinct theory means that Forbes cannot argue that theory unless he earlier pled that theory.  He did not.  He only pled—and the parties' pretrial order speaks only to—negligent hiring and retention.  The parties' pretrial order controls.[63]

Substantively, even a properly pled negligent supervision claim would fail given Forbes' relationship to Kinder Morgan.  Forbes' claim effectively re-asks the Court "whether Kansas would permit an employee who is injured by a fellow employee to recover from the employer under negligent retention and/or negligent supervision theories."[64]  Twenty years ago, the Court answered that "Kansas has not and would not recognize the torts . . . in th[at] factual context."[65] In the 20 years since, the Court has reconsidered that question—relating to negligent hiring, negligent supervision, or negligent retention theories—on at least five occasions; the Court's answer has never changed.[66]  No facts or authority provided by the parties convince the Court that any intervening changes in Kansas law now disturb the Court's expressed position.

Even so, Kinder Morgan also denies that it should have considered Rogers unsafe based on the pre-fight information within its knowledge.  An employer's direct liability for an

---

[62] *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 331, 961 P.2d 1213, 1223 (1998).

[63] *See* Fed. R. Civ. P. 16(d).

[64] *Beam v. Concord Hosp., Inc.*, 920 F. Supp. 1165, 1165 (D. Kan. 1996).

[65] *Id.* at 1166.

[66] *See, e.g.*, *Topolski v. Chris Leef Gen. Agency Inc.*, 2012 WL 984278, at *3–4 (D. Kan. Mar. 22, 2012); *Desmarteau v. City of Wichita*, 64 F. Supp. 2d 1067, 1083 (D. Kan. 1999); *McClure v. Nolan*, 1997 WL 458362, at *1 (D. Kan. July 15, 1997); *Kloke v. Buckley Indus., Inc.*, 1996 WL 363032, at *11–12 (D. Kan. June 28, 1996); *Farris v. Bd. of Cty. Comm'rs of Wyandotte Cty.*, 924 F. Supp. 1041, 1051 (D. Kan. 1996).

employee's harmful conduct depends, in part, on the employer's awareness of that conduct and its probable harms. The employer must "know[] of the employee's particular quality or propensity," and that knowledge must give the employer "reason to believe that an undue risk of harm exists to others as a result of continued employment of that employee."[67] Forbes argues that Kinder Morgan knew of Rogers' tendency to risk others' safety through dangerous pranks. He supports his argument with statements attributed to two of his former coworkers, Brad Livinston and Anderson.[68] Livinston only "worked for . . . the predecessor of Kinder Morgan," and his declaration shows no basis to impute his knowledge of Rogers' behavior specifically to Kinder Morgan. His statements also lack sufficient detail for the Court to ascertain who specifically reported what facts to whom within Kinder Morgan's predecessor.

Anderson's deposition statements also lack probative force. Anderson recalled hearing second-hand—as a non-supervisory employee—others' comments about Rogers' involvement pranks. But he declared that he "had no [personal] knowledge of [Rogers] doing anything," because Rogers never bothered him and he never observed Rogers bothering others. Those statements occurred in the context of Anderson discussing his remarks to LaFrenierre during Kinder Morgan's investigation. Whether knowledge of others' second-hand, unspecific comments suffice to show that Anderson personally knew that Rogers played pranks on others, Anderson's knowledge did not become Kinder Morgan's knowledge until LaFrenierre's investigation. After that investigation, Kinder Morgan disciplined Rogers. The undisputed facts otherwise fail to show that, before the investigation, Mask, LaFrenierre, or any other Kinder

---

[67] *Wayman v. Accor N. Am., Inc.*, 45 Kan. App. 2d 526, 539, 251 P.3d 640, 649 (2011).

[68] Kinder Morgan raises additional, pertinent facts in its brief. Because Forbes' response does not rely on those facts, however, the Court will not consider them.

Morgan manager responsible for Rogers knew or should have known that he—dangerously or otherwise—pranked his coworkers.

Duty or no duty?  Knowledge or no knowledge?  The evidence resolves these essential questions in Kinder Morgan's favor.  Accordingly, the Court grants summary judgment to Kinder Morgan on Forbes' negligent hiring and negligent retention claims.

## D. Intentional Infliction of Emotional Distress (Outrage)

Outrage—Forbes' final claim—protects an individual's "peace of mind" from "atrocious and utterly intolerable" disturbances.[69]  The Kansas tort of outrage requires proof that defendant (1) intentionally or in reckless disregard of plaintiff (2) performed "extreme and outrageous" acts (3) that causally relate to plaintiff's (4) "extreme and severe" mental distress.[70]  Toward those proofs, Forbes aims this narrative: because Kinder Morgan wantonly left Forbes to defend himself against a notorious, harassment-policy-ignoring bully and then manufactured a violence policy to justify depriving Forbes—but not the bully—of his well-earned job and health benefits, Forbes suffered undue career-ruin and grief.  Against that narrative proof, Kinder Morgan insists that—properly distinguished from Rogers' conduct—it acted and Forbes' suffered too mildly to hold it accountable for outrage.

As a threshold matter, the Court decides whether the evidence tends to show that the defendant's acts legally qualify as "extreme and outrageous."[71]  Formally, conduct earns the "extreme and outrageous" label only if the conduct's character is "so outrageous" and its degree "so extreme" that a civilized society overall would regard the conduct as "atrocious and utterly

---

[69] *Roberts v. Saylor*, 230 Kan. 289, 291, 293, 637 P.2d 1175, 1178, 1179 (1981).

[70] *Bolden v. PRC Inc.*, 43 F.3d 545, 553 (10th Cir. 1994) (applying Kansas law).

[71] *Id.*

intolerable."[72]  Informally, courts know to apply the "extreme and outrageous" label "when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, 'Outrageous!' "[73]

Hearing of Kinder Morgan's actions, some citizens might feel for Forbes; but the average citizen would not feel—let alone exclaim—outrage for him.  Cautious not to overlook the legally material distinction between Rogers' actions and Kinder Morgan's actions, the Court isolates three acts that Forbes' narrative possibly attributes to Kinder Morgan: Kinder Morgan failed to protect Forbes; Kinder Morgan invented a policy to justify firing Forbes; and Kinder Morgan reported that Forbes' violated company policy.[74]  For the same reasons that Forbes' evidence fails to show that Kinder Morgan negligently employed Rogers, the evidence also fails to show that Kinder Morgan intentionally or recklessly failed to protect Forbes from Rogers.

That leaves the average citizen to consider whether s/he vehemently resents Kinder Morgan for determining and announcing that Forbes violated a company-wide antiviolence policy that—nonspeculative inferences in Forbes' favor—took effect the day after Forbes punched Rogers.  Measured against the only case cited by Forbes, these facts are far from atrocious and utterly intolerable.  Forbes brings *Taiwo v. Vu*'s law, but not its facts, to the Court's attention.[75]  The Kansas Supreme Court reasoned that "[r]easonable people could regard

---

[72] *Taiwo v. Vu*, 249 Kan. 585, 592, 822 P.2d 1024, 1029 (1991).

[73] *Id.*

[74] Only Kinder Morgan's actions matter; Kansas does not hold an employer vicariously liable for the outrageous, independent conduct of an employee.  *See Bolden*, 43 F.3d at 554–55.

[75] *Taiwo*, 249 Kan. 585, 822 P.2d 1024.

[Vu's] behavior as atrocious and utterly intolerable in a civilized society."[76]   What did Ms. Vu do?  To spite the Taiwos,

> she assaulted, battered, and falsely imprisoned Mrs Taiwo; she first lied to a law enforcement officer when she called the police and then she lied to [another officer], both times claiming Mr. Taiwo had vandalized her van; she filed a false police report against the Taiwos concerning her Cadillac; Ms. Vu then induced an employee to lie to the police about the Taiwos' involvement in vandalism and when she was confronted, she challenged [the detective] to prove the Taiwos had not committed the vandalism.[77]

Even less extreme "extreme and outrageous" conduct typically involves constant, targeted abuse.[78]  In Forbes' case, the allegedly outrageous conduct amounts to his employer's reasonably expressed opinion.  Specifically within the bounds of decency, freedom remains for an employer "to express . . . an unflattering opinion,"[79]  act irresponsibly,[80] or otherwise cause isolated "indignities" and "annoyances."[81]  The law expects and requires "members of the public . . . to be hardened to a certain amount of criticism," including reasonable employment-ending judgments.[82]  Forbes' claim expects more than the law provides.  Because the law does not

---

[76] *Id.* at 593, 822 P.2d at 1030.

[77] *Id.* at 593, 822 P.2d at 1029–30.

[78] *See Gomez v. Hug*, 7 Kan. App. 2d 603, 609–11, 645 P.2d 916, 922 (1982); *Laughinghouse v. Risser*, 754 F. Supp. 836, 843–44 (D. Kan. 1990) (applying Kansas law); *but see Bolden*, 43 F.3d at 554 (distinguishing *Gomez*).

[79] *Roberts*, 230 Kan. at 295, 637 P.2d at 1181.

[80] *See Dana v. Heartland Mgmt. Co.*, 48 Kan. App. 2d 1048, 1059, 301 P.3d 772, 781 (2013); *Ferguson v. Kellstadt*, 2008 WL 307488, at *3 (Kan. Ct. App. 2008).

[81] *Taiwo*, 249 Kan. at 592, 822 P.2d at 1029 (quotation omitted).

[82] *Id.*

protect Forbes' peace of mind from Kinder Morgan's acts, the Court grants summary judgment to Kinder Morgan on Forbes' intentional infliction of emotional distress claim.[83]

### IV.    Conclusion

Many have yearned to strike an irksome coworker.  But few relent to that impulse, break their coworker's nose, lose their job, and then *successfully* sue their former employer.   All evidence considered, Kinder Morgan has shown the absence of facts essential to each of Forbes' four claims.  Age did not play a determinative role in Forbes' employment termination.  Forbes' worked at will for Kinder Morgan, until fired for cause.  Kinder Morgan hired and retained Rogers without owing or, alternatively, breaching a duty to Forbes.  And overall, society would tolerate Kinder Morgan's actions.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 39) is hereby **GRANTED**.

**IT IS SO ORDERED**.

Dated this 22nd day of March, 2016.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[83] Kinder Morgan also requests summary judgment on Forbes' punitive damages claims.  Given that Forbes' four primary claims fail based on the undisputed facts as a matter of law, the Court need not examine whether those claims' appurtenant punitive damage requests independently fail.